## HARRIS' APPEAL.

A parol agreement by a son to relinquish his share in his father's real estate to his sisters is void under the statute of frauds.

Appeal from the Common Pleas of Union County. ˙ No. 235 January Term, 1885. In Equity.

This case was a Bill in Equity to enforce an alleged family arrangement or agreement between the heirs of John J. Lewis, deceased, relative to his estate; and it was claimed that under this arrangement, rights have attached, and that outlays and improvements have been made, so that the parties cannot now be placed in statu quo, and that equity demands the fulfillment of the family arrangement so made. The bill was brought by Deborah G. Harris, Sarah J. Lewis, Samuel W. Zeigler and Martha E. Zeigler, his wife, in right of said Martha E. and S. Lewis Zeigler, plaintiffs, against Thomas S. Lewis, defendant. The facts found by the Master are as follows:

Guided by such authority, the Master excludes the testimony of parties in interest relative to matters which occurred in the lifetime of John L. Lewis, but takes into consideration the conversations and admissions of said parties since his decease, and the proof of facts which have happened since that event.

The Master finds that some time between the years 1830 and 1840, John L. Lewis, the intestate, removed, with his family, to Centre county, Pennsylvania, and occupied a large tract of land of which he was the owner. He was at this date somewhat advanced in years, his son Thomas S. Lewis (the Deft.) having arrived at manhood, and seeming to have the first place in the labors and management of the farm.

˙ Thomas was a single man, and he, together with his sisters Deborah, Sarah and Martha, resided with their father, the said John L. Lewis, in the same homestead; another sister, Rebecca, married to Daniel Lamb, also resided in Centre county, near the Lewis Farm.

Not very long after taking up his residence upon this farm, but the exact date is not stated, John L. Lewis constructed a division fence, and set apart about one hundred and fifty acres of land to his son Thomas S. of which land he has ever since

had the possession and control, and of which he claims to be the owner. Upon this tract, Thomas built a house, in the year 1843 or 1844, and a barn about the year 1851 or 1852.

The Master cannot tell whether the tract so cut off of the main tract by John L. Lewis ·was sold or given to his son Thomas, or whether the division line was for the purpose of dividing the tract into two farms, nor is it material that the Master should decide that question, the defendant has had possession and control of it for many years, and has erected buildings and improvements upon it. No deed seems to have been delivered by his father to Thomas for it, but an unexecuted deed for the premises from John L. Lewis to Thomas S. Lewis was produced by Sarah J. Lewis, after the death of her father, when an effort was being made to amicably adjust matters, in the early part of the year 1883.

It is also to be noticed, that Thomas had not only the control of the land divided off to him, but also the chief management and supervision of the whole body of land, including the Mansion farm. This, however, would only be natural from the respective ages of father and son. While he resided in Centre county, John L. Lewis had sold off part of his tract.

In 1855, he removed to Lewisburg, with his family, and having purchased the premises in said borough at the corner of St. Anthony street, occupied it as his homestead.

About this time, he sold all the remainder of the Centre county farm, excepting the part previously set off to Thomas and excepting also some 20 or 30 acres which now being annexed to the part previously set off made the tract in Thomas S.'s possession, about 173 acres as described in the Bill.

In the year 1869, May 20th, John L. Lewis died, in Lewisburg intestate, the owner of considerable real and personal estate, leaving, to survive him Thomas S. Lewis, Rebecca R. Lamb, Deborah G. Harris, Sarah J. Lewis and Martha E. Ziegler, in all five children, as his Heirs at Law.

The said Thomas S. Lewis and Rev. Samuel W. Ziegler, the husband of Martha E., became the administrators of the estate. The estate has not yet been settled.

After the death of their father Thomas S. Lewis, Mr. and Mrs. Ziegler, Mrs. Harris and Sarah J. Lewis continued to live together in the homestead, at Lewisburg, as one family, for several years; Mrs Lamb residing with her husband, in Centre county.

At the time of the death of John L. Lewis, the title to the real estate described in the Bill stood as follows:

Tract No. 1. Being 173 acres and allowance, situated in Marion township, Centre county, Pa. The title was in John L. Lewis, by virtue of deed of Benjamin Morrison and wife to him, dated Aug. 17, 1841, (being a duplicate for a lost deed dated April 1, 1833), for 3 tracts of land, containing, in the aggregate, 520 acres and 134 perches and allowances.

Tract No. 2. Being Milesburg Lot, title in John L. Lewis.

Tract No. 3. "Clingan Place," title in John L. Lewis and Thomas S. Lewis, tenants in common by virtue of deed of James F. Linn and Levi Sterner, executors of the will of Nicholas Mensch, dec'd, dated April 1, 1856, for 208 acres and 95 perches. Consideration, $2,565.29.

Tract No. 4. Tract of land in Lewisburg, at corner of St. Anthony street, containing 6 acres 60 perches. Title in John L. Lewis.

Tract No. 5. Tract of land in Lewisburg, known as Boarding House Lot on University avenue. Title in John L. Lewis.

Tract No. 6. Tract of land in Kelly township, called the Bickel Place. Containing 38 acres and 91 perches. Title in John L. Lewis.

Tract No. 7. Tract in Kelly township, containing 13 acres and 30 perches. Title in John L. Lewis.

Tract No. 8. "The Kelly Farm." Title in Thomas S. Lewis, by virtue of a deed to him executed by Philip Stahl, Adm'r. of Estate of Joseph Kelly, dec'd, dated April 1, A. D. 1861, for 210 acres, neat measure, for consideration of $6,594.00.

Rev. S. W. Ziegler, acting under a verbal authority from the daughters of John L. Lewis, being told by them to take charge and act for them, took into his possession certain of their title papers, and received the rents, issues and profits of

all the said real estate, except the Centre county farm, and the Kelly farm, from which he never received anything, and excepting the Boarding House property from which he received no rents after 1874.

Among the incomes of other real estate, Mr. Ziegler received those of the Clingan farm, and notified the tenants on that place that a division had been made, and that the said place now belonged to the girls.

As has been stated, after the decease of John L. Lewis, who died in 1869, aged about ninety-one years, Thomas, Sarah, Mrs. Harris and Mr. and Mrs. Ziegler, continued to live together as one family until the year 1871, then Mrs. Harris desired to go to housekeeping by herself, and she and her brother Thomas moved to the Boarding House place, and occupied one end of it, Mrs. Harris taking her furniture with her. Prior to this time, Mr. Ziegler had received the rent from both sides of the Boarding House property (it seems to have been adapted for two families) from the date of old Mr. Lewis' death, and after Thomas and Mrs. Harris went in he continued to receive the rents from the side not occupied by them until 1874. In 1872, Thomas married. In 1874, Mrs. Harris removed to Centre county, to reside with Mrs. Lamb, whose husband had died, and from that date Thomas S. Lewis, who had continued his residence at the Boarding House place, received the rents from the portion of the house not occupied by him.

The Master finds that there was a verbal promise made by Thomas S. Lewis to his father, John L. Lewis, in the lifetime of the latter, and that the former agreed and promised that, in consideration of his having a clear title to the Centre county farm, in addition to the Kelly farm, which he already had, he was to release to his sisters all of his interest in the real and personal estate, and besides that to convey to them his undivided interest in the Clingan farm.

That there was an agreement or understanding of this kind is shown by the testimony of S. Lewis Ziegler and of J. Merrill Linn, Esq. The arrangement appears to have been made in the lifetime of John L. Lewis, between him and his son Thomas The date of the promise or agreement cannot be

determined. Its terms would indicate that it was made in view of the old man's death, for it contemplates a releasing of interests in his estate, and the parties would be in no situation to act until his decease had vested them with rights and an estate.

S. Lewis Ziegler speaking of the interview with Thomas S. Lewis in April 21, 1883 says: "That same afternoon he brought and delivered to me at my home all the papers in his possession. He then said that he was always willing to live up to his promises, and as his sisters had done their part, he was now ready to release to them as he had agreed."

This language was made use of by Thomas after he had carefully inspected a quit claim deed for the Centre county farm, which had been duly executed and acknowledged, and which was tendered him that day by S. Lewis Ziegler.

In the month of January, 1883, he had told S. Lewis Ziegler that he (Thomas) was now willing, and had always been willing, to abide by the arrangement made by his father and him—made between his father and him—and stated what the arrangement was.

A few days after April 21, 1883, the papers being prepared for execution, he examined them carefully—said "they were all right, and he was now ready to sign them." His wife, however, did not concur, and the releases were not executed.

He told Mr. Linn about the same time that the arrangement was stated, that it was as Mr. Ziegler had said, and would have been done long ago if it had not been for Ziegler. Mr. Linn then asked him to let him understand the arrangement distinctly, saying to Mr. Lewis, "You have a joint ownership with your father in the Clingan place, and you have the whole title to the Kelly place, now do I understand you to say that if they (the heirs) make you a title for the Centre county farm you will release all your interest in the rest of the estate, your interest in the personal estate, and convey the Clingan farm? He said yes, that was the arrangement, and that I am ready to do, making the remark that he had already the title to the Kelly place, and there was no need of making any title as to that."

The Master cannot find, from the testimony that there was any other express or definite agreement entered into by the heirs with each other after their father's death.

There may have been an understanding among them, always existing, that matters were to be arranged, and a division of property made on the terms of the verbal agreement between Thomas and his father.

When we ask, how does it happen that fourteen years were allowed to roll by, and an agreement, if there was one, remain unexecuted? The only explanation which we can get from the testimony is that afforded by the testimony of Rev. S. W. Ziegler, who says: "Mr. Thomas Lewis has always refused to carry out the arrangement unless the ($1,800.00) eighteen hundred dollars (Kelly dower) was paid. Thomas Lewis refused any settlement unless the $1,800 was paid. He always acknowledged the agreement with his father, but he always wanted that $1,800.

Nothing is mentioned, however, by S. Lewis Ziegler or by J. M. Linn, Esq., as to any claim of $1,800 by Thomas S. Lewis, when they talked with him as to the agreement, and the Master finds the agreement as hereinbefore stated by him, but can find no subsequent express agreement, entered into by the heirs with each other after the decease of John L. Lewis.

As before stated, there was an unexecuted deed from Jno. Lewis to Thomas S. Lewis in the possession of Sarah J. Lewis, and which is spoken of by S. Lewis Ziegler, in his testimony. The paper is dated May 1st, 1862, for 173 acres and 30 perches, with allowance, in Marion township, Centre county. Consideration, $1,460.

Tract No. 6, in the bill mentioned, has been conveyed to S. Lewis Ziegler.

It appears, from the testimony of S. Lewis, Ziegler, that, at the time of the conversation with Thomas S. Lewis, in January, 1883, the latter told him that John L. Lewis had signified his intention of giving him (Ziegler) the piece of land described as No. 6 in the bill, and it was afterwards conveyed to him by all the parties interested.

## OPINION OF MASTER.

In this case specific performance is sought by bill in equity of a family arrangement or agreement alleged to have been made between the heirs of John L. Lewis, dec'd, relative to his estate, and which was acted upon by them during many years. It is claimed that, under this arrangement, rights have attached, and that outlays and improvements have been made so that the parties cannot now be placed in "statu quo," and that equity demands the fulfilling of the family arrangement so made.

The first subject for consideration is, What arrangement of any was made, when, and between whom, and what are its terms and effects? The only express agreement proven was a parol promise or understanding made between Thomas S. Lewis and his father, some time before the decease of the latter, by which the former, in consideration of a clear title to the Centre county farm and the Kelly farm (which latter he had) promised his father to release to his sisters all of his interest in the rest of the estate, real and personal, and also to convey to them his undivided interest in the Clingan farm.

When this agreement was entered into, Thomas S. had possession of the Centre county farm, but did not have, nor has he yet the title thereto. He had the undivided one-half of the Clingan farm by title running back to 1856, and the whole title to the Kelly farm, by deed dated in 1861. His sisters, at this time, were not vested with any rights as to their father's estate, for he was yet alive, and the maxim is "Nemo haeres est vivendi." We cannot say positively when this promise was given, most likely in the last year of the intestates life, and if so, seven or eight years had already gone by since the deed had been made to Thomas S. Lewis for the Kelly tract. It is easily seen that the agreement was of an executory character, and was not to be carried out until after the decease of John L. Lewis, for it stipulates for releases of interests in his estate, and rights which would only become vested upon his death. This agreement is the one to which Thomas S. Lewis refers in the testimony of S. Lewis Ziegler. It seems to be the one referred to by Thos. S. Lewis in the testimony of Mr. Linn,

and is that, beyond question, which is alluded to by Rev. S. W. Ziegler, in his evidence.

The learned counsel for the plaintiffs contend, however, that they do not stand so much upon an agreement between Thomas and his father as on an agreement between Thos. and the other heirs; but we may well, ask, When and where was such an agreement ever made, and what were its terms? We are left in doubt as to whether they ever subsequently got together and agreed upon terms of a definite character. If there was a subsequent arrangement or agreement, it seems to the Master that, under the evidence, it would have to be altogether a matter of inference, and-be deducible alone from the action of the parties.

The agreement here which is shown, and apart from which none other is shown, was the agreement between Thomas and his father; but the Master cannot see how it would be such an arrangement as would fall in the class of family arrangements or settlements of family disputes, to which the law laid down in Wister's Appeal 30 Smith, page 484, and kindred cases would apply.

At the time this agreement so made before the death of John L. Lewis was entered into, we do not know which of the heirs, whether all, or any, except Thomas, were present, and indeed it does not matter, for they had no standing, not being parties to it. That agreement could not be an adjustment of family disputes among heirs, as contemplated in cases cited, and there apparently existed no difficulties which old Mr. Lewis could not at that time have adjusted by will, or by other means within his own control. That this agreement was the one regarded by the heirs as the agreement in the case is made clear by the testimony of Rev. S. W. Ziegler, who says, "Mr. Thomas Lewis has always refused to carry out the arrangement unless the $1,800 was paid. He refused any settlement unless the $1,800 was paid. He always acknowledged the agreement with his father, but always wanted that $1,800." In Wister's Appeal, 30 Smith 495, the late Judge Sharswood states that it is certainly true that all agreements for the compromise and settlement of family disputes are favorably

regarded both in Courts of Law' and in Equity; but he also says "that in a Court of Equity unless it is perfectly clear that the minds of the parties .have come together and been in accord upon all the material terms of the agreement, a Chancellor ought to decline to interfere, but leave the parties to their legal remedies. In the present case, we have an arrangement made between father and son, made in contemplation of. the father's decease. A parol agreement of an executory character, to which the defendant's sisters are not privy, and of whose willingness to ratify it and adopt it we must resort to interfere. This agreement has never been carried out, Thomas always having refused to do so, in the language of Mr. S. W. Ziegler. The nearest the parties here (that is the heirs of John L. Lewis and Thomas S. Lewis) ever came to being in accord as disclosd by the testimony, was on the 23d of April, 1883, fourteen years after the death of old Mr. Lewis, Thomas then said, "He was always willing to live up to his promises; and as his sisters had done their part, he was now ready to release to them as he had agreed." Here was a point of time when the minds of the parties seemed to have been in harmony, from all that appears, but the existing accord was only for a brief period. Thomas changed his mind, and refused to consummate the agreement. Now, what was there to prevent a revocation or change of mind of either of the parties to it, at any point in the whole history of this agreement if it was so desired? Even after the promise made by Thomas to his father, what would have prevented Mr. John L. Lewis from making a different disposition of his property by will, or what was there to have prevented a sale by him of all his realty, or how could such a promise bind the heirs to release to Thomas what rights they may have had to the Centre county farm, if they did not desire to be bound by their father's arrangement with Thomas ?

Even if this arrangement was afterwards adopted by the heirs, and if Thomas, in 1883, looking at the quit claim deeds recently executed by his sisters to him, did say that now he was ready to fulfill the promise he had given his father some fourteen years before, yet what was there to prevent either Thomas or the others from receding from the arrangement, and

revoking it at any time before it was consummated, and refusing to be bound by it?

In the master's opinion, to sustain this as an agreement or family arrangement not only involves difficulties in regard to parties and terms, but chief obstacle of all, relating as it does to the passing of the title to real estate, it should have been in writing. On the contrary; it is in parol and coming within the statues of frauds, is on that account void.

We now look at the case from another standpoint: It is clear that any agreement as to mutual releases was never carried out; but although papers may not have been exchanged, was there such a division of the real estate made after the death of John L. Lewis, and such a taking of the property as amounted to an amicable parol partition? Upon the decease of John L. Lewis intestate, in the year, 1869, whatever real estate he had, vested in his heirs at law and would be divisible among them by proceedings had in partition.

Did the arrangement or agreement, as acted upon by the parties, constitute a partition of the premises? It is claimed, in the bill, that there was an amicable partition. Undoubtedly partition can be made by parol.

"A parol partition carried into effect by making a division line on the ground, and taking possession of the respective purparts is good, notwithstanding the statue of frauds." Ebert vs. Wood, I Binn, 216; Rider vs. Maul, 46 Penna. St., 376.

"A parol partition between tenants in common who derive their title by descent, if fair and equal, and followed by a due execution, is binding. upon all the parties, though some of them be coverts or under age." Calhoun vs. Hays, 8 W. & S. 127.

"When a partition by agreement is actually executed and the parties take possession of their respective purparts, but the deeds intended to carry such partition into effect are never made, the purparts descend to the heirs of the several heirs in severalty." Duncan vs. Clark, 7 Watts 217.

"An unexecuted parol partition is void." Snively vs. Luce, I. Watts 69.

3 Wa 3

It appears to be an essential element of a valid parol partition that it shall be executed, and that the parties shall go into possession of their respective purparts. If there was any partition here, it would be merely between Thomas S. Lewis on the one side and his sisters on the other, Thomas taking his part in the severalty, and the other four heirs continuing a tenancy in common as to their portion. There is no evidence at all that any division was made of real estate among the daughters of old Mr. Lewis, and as to Thomas, the possession of what is alleged to be his purpart certainly did not originate upon or after the decease of his father. His possession of the Centre county farm would date back to about the year 1840 ; of the undivided one-half of the Clingan farm to the year 1856 ; and of the Kelly farm to the year 1861. But, in point of fact, the defendant did not restrict his possession to the portion it is alleged properly fell to him under the amicable partition arrangement. After residing for a couple of years after his father's death, in the homestead, at Lewisburg, he along with Mrs. Harris, his sister, in the year 1871, removed to the Boarding House property, where he has since resided. Living in one end of the premises after a comparatively short time he began to draw the rents from the other portion which he did not occupy, and thus he has held out to the world all the indication of ownership on his part, an exhibition utterly at variance with the idea of an executed partition by which the boarding house property had become the possession and property of his sisters and not of himself. While it may be the case that Mr. Ziegler, as agent or by the parol authority of the daughters of John L. Lewis, received the rents, issues and profits of the Clingan place and other real estate, there does not seem to be that line of conduct on the part of Thomas and his sisters which indicate that they had taken exclusive possession and control of their purparts, and that Thomas had confined his possession to his alleged portions, to wit: "the Centre county farm," and the "Kelly place." The conversations had between Thomas and his sister, Mrs. Ziegler, which the latter thinks occurred after her father's death and wherein Thomas said he would pay interest on the money which old Mr. Lewis had in the Kelly farm, would also rather go, in the

Master's opinion, in opposition to the view of a partition having been made or contemplated. It would be more like the acknowledgment of a debt than otherwise.

From the whole case, the Master is of the opinion that there was not that parol partition of the real estate made which the law will make effective and binding to the parties. Neither in the opinion of Master, can the position be sustained that here was a parol gift of lands by John L. Lewis to his children. There is no doubt that such a gift can be made and be good and valid.

In Syler vs. Eckhart, I. Binn, 378, and other cases, it is decided that a parol gift of lands by a father to his son, accompanied with possession and followed by valuable improvements, is valid, notwithstanding the statute of frauds. But how can we find that old Mr. Lewis gave any distinct parcels of real estate to his respective children? We find no clear and competent evidence of such gifts accompanied by possession and improvements; nothing which is sufficiently satisfactory to warrant a decree. Nor is there here evidence of a parol contract here for the exchange of lands which would be operative.

Ownership and possession of the property to be exchanged must precede exchange. Then such a contract must be proved by competent evidence, and satisfactorily established. It cannot be inferred from the declaration merely of one of the parties. Taylor vs. Henderson, 2 Wright 60.

In that case the judge in his opinion, says, there is "no proof of a contract between the parties to it face to face, nor such an execution of it as could be referable to that mode of transfer."

Under all the circumstances of the case, the Master is of the opinion that it would not be equitable to enforce the specific performance of the alleged agreement, or to decree the relief prayed for by the plaintiff; and that, under the evidence a Chancellor ought to decline to interfere, but should leave the parties to their legal remedies.

---

Upon exceptions filed by the plaintiffs, the Court overruled

the exceptions, and confirmed the report, on December 15th, 1884, in the following opinion, per

BUCHER, P. J.

Sundry exceptions have been filed to the report of the Master by the complainant, and the respondent has filed one in regard to the costs. It will be useless to notice them *seriatim*. The 5th of complainants bill discloses the basis of their claim to relief, to wit that the father, John L. Lewis, and his son, Thomas S. Lewis, the respondent had bargained that the latter would accept in full of his share in his father's estate, real and personal, a deed conveying the interest of the father in a tract of land No. 3 (Clingan farm), held in common between the father and son, except that S. Lewis Ziegler should receive a conveyance of tract No. 6, described in the bill. This agreement being in parol is clearly obnoxious to the statue of frauds, unless executed by the vendee taking possession in pursuance of the contract. But it is shown that Thomas S. Lewis, the son, occupied the Clingan farm No. 3 as early as 1856, so no possession was taken in pursuance of the contract.

To enforce this contract would be to carry out an alleged contract with the dead father; and hence none of the heirs could be competent witnesses under the act of 1869 and its supplements, Thomas S. Lewis not being permitted to testify in his own behalf.

The Master has properly rejected the testimony of the parties.

2d. Next, did the heirs of John L. Lewis make parol partition among themselves, or as between Thomas S. Lewis and the other heirs ?

The Master finds, as a fact, that they did not, and a careful study of the evidence shows not that a new arrangement in partition was made after the death of the father; but that the other heirs, or some of them, sought to carry out the alleged parol agreement between Thomas S. Lewis and his father. The Master finds that no possession of the respective purparts was taken by the parties to whom the purparts were assigned; on the contrary, the real estate was in no form as to possession, changed after the alleged parol partition. On the question of

a parol partition after the father's death, all the heirs were competent witnesses, and heard, but the evidence fails to prove it when all are heard, and the Master so finds.

The finding of the facts, by a Master, are conclusive, unless plain and palpable error be shown. This has not been done, and the findings and conclusions of the Master are sustained.

And now, Dec. 15th, A. D., 1884, all the exceptions are overruled and the bill is dismissed; and it is further ordered and decreed that four-fifths of the costs be paid, as well as the Master's fee by the complainants, and that the respondent pay the other one-fifth of the costs as well as the Master's fee.

---

Plaintiffs then appealed, complaining of the action of the Court as above stated.

*Messrs. Wolfe & Leiser and B. F. Junkins, Esqs.* for plaintiffs in error, argued that family settlements and arrangements are favored by the policy of the law; Walworth vs. Abel, 52 Pa. 372; Shartel's Appeal, 64 Pa. 28; Wistar's Appeal, 80 Pa. 492; Jourdan vs. Jourdan, 9 S. & R. 277; Power's Appeal, 63 Pa. 445; Quarles vs. Quarles, 4 Mass., 680; Renny vs. Tucker, 8 Mass. 143; Hume vs. Hume, 3 Pa. 150; Follmer's Appeal, 37 Pa. 124; Woolfolk vs. Woolfolk, 4 Dana 535; Hurlburt vs. Phelps, 30 Conn. 42. A parol partition is good when possession is taken under it; Ebert vs. Wood, 1 Binn. 216; Rider vs. Maul, 46 Pa. 376. The plaintiffs were competent witnesses; Taylor's Executor vs. Kelly, 80 Pa. 95.

*Messrs. Dill & Beale, Esqs., contra,* argued that the Master found the facts in the case were not to be regarded as a family settlement; Wistar's Appeal, 80 Pa. 484; and relied on the opinion of the Master.

The Supreme Court affirmed the decree of the Common Pleas on May 25, 1885, in the following opinion:

PER CURIAM.

The Court below was clearly right in dismissing the plaintiffs' bill. The alleged arrangement between John L. Lewis and his son, Thomas S. Lewis, no matter how clearly proved is directly within the statute of frauds; the agreement not

having been reduced to writing and signed, while the learned Master finds as a fact that the heirs of John L. Lewis did not make parol partition between themselves. The most the evidence discloses is, that after the death of John L. Lewis, some of the heirs endeavored to enforce or carry out the attorneys' oral arrangement between the decedent and his son, Thomas S. Lewis. There was no change of possession under this alleged parol partition; on the contrary, the possession continued as it was before it was made. We will not disturb the findings of a Master upon questions of fact unless clear error is pointed out, and this has not been done in this case.

> The decree is affirmed and the appeal dismissed at the costs of the appellants.